UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITIBANK, N.A., <br><br> *Plaintiff*, <br><br> v. <br><br> HPS INVESTMENT PARTNERS, LLC AND SYMPHONY ASSET MANAGEMENT, LLC <br><br> *Defendants*. | No. 1:20-cv-06539 |

**MEMORANDUM OF LAW IN SUPPORT OF CITIBANK'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

John F. Baughman (jbaughman@jfblegal.com)
Nathaniel E. Marmon (nmarmon@jfblegal.com)
299 Broadway, Suite 207
New York, New York 10007
(347) 241-6347

*Attorneys for Plaintiff Citibank, N.A.*

# **TABLE OF CONTENTS**

page

TABLE OF CONTENTS ............................................................................................................. 2

TABLE OF AUTHORITIES ....................................................................................................... 3

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 2

ARGUMENT ............................................................................................................................... 3

I.    CITIBANK WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF AND A TEMPORARY RESTRAINING ORDER. ................................................................... 4

II.    CITIBANK IS LIKELY TO SUCCEED ON THE MERITS. ............................................. 6

    A.    The Payments Were a Mistake ............................................................................ 6
    B.    The "Discharge-For-Value" Rule Does Not Bar Preliminary Relief ............................ 7

III.    THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY IN CITIBANK'S FAVOR. 10

IV.    THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF. ...................................... 11

CONCLUSION ......................................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Banca Commerciale Italiana, N.Y. Branch v. N. Trust Intern. Banking Corp.*,
   160 F.3d 90 (2nd Cir. 1998)......................................................................................................8

*Banque Worms v. BankAmerica Intern.*,
   77 N.Y.2d 362, 570 N.E.2d 189 (N.Y. 1991) ................................................................. passim

*BMO Harris Bank N.A. v. Salin Bank and Trust Company*,
   2020 WL 2571251 (S.D. Ind. May 21, 2020)...........................................................................8

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*,
   346 F. Supp. 3d 432 (S.D.N.Y. 2018).......................................................................................6

*Brenntag Int'l Chemicals, Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999)......................................................................................................4

*Carlisle v. Norris*,
   215 N.Y. 400, 109 N.E. 564 (N.Y. 1915) .................................................................................1

*De Beers Consol. Mines v. United States*,
   325 U.S. 212 (1945)..................................................................................................................4

*Ger-Nis Int'l, LLC v. FJB, Inc.*,
   2007 WL 656851 (S.D.N.Y. Mar. 1, 2007) ..............................................................................4

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)........................................................................................................4

*In re Awal Bank, BSC*,
   455 B.R. 73 (Bankr. S.D.N.Y. 2011) ........................................................................................8

*In re Calumet Farm, Inc.*,
   398 F.3d 555, 560 (6th Cir. 2005) .......................................................................................9, 10

*New York ex rel. Schneiderman v. Actavis*,
   787 F.3d 638 (2d Cir. 2015)......................................................................................................3

*Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*,
   2013 WL 1915330 (S.D.N.Y. May 9, 2013) ............................................................................4

*Qatar National Bank v. Winmar, Inc.*,
   650 F. Supp. 2d 1 (D.D.C. 2009)..............................................................................................9

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*,
   144 F. Supp. 2d 241 (S.D.N.Y. 2001)............................................................................4

*Roswell Capital Partners LLC v. Alternative Const. Techs.*,
   No. 08 CIV 10647 (DLC), 2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ..................................8

*S.E.C. v. Wallis*,
   1984 WL 803 (S.D.N.Y. May 31, 1984) ...............................................................................11

*Spencer Trask Software & Info. Servs. v. RPost Int'l Ltd.*,
   190 F. Supp. 2d 577 (S.D.N.Y. 2002)..................................................................................3

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
   2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010).........................................................................6

Plaintiff Citibank, N.A. ("Citibank") respectfully submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunction against Defendant HPS INVESTMENT PARTNERS, LLC ("HPS") AND SYMPHONY ASSET MANAGEMENT, LLC ("Symphony") (together, "Defendants") barring them from removing, withdrawing, transferring, assigning, or otherwise disposing of money mistakenly transferred to them by Citibank on August 11, 2020. Citibank further requests a preliminary injunction directing Defendants to remit to Citibank the full balance of the mistakenly transferred funds.

## PRELIMINARY STATEMENT

The issues here have already been decided in this Courthouse. The mistaken payments at issue arise from the same events underlying *Citibank v. Brigade Capital Management,* 1:20-cv-06539 (the "Brigade Action"). In the Brigade Action, Citibank sued a fund manager ("Brigade") who had received approximately $175 million in error following a mixup at Citibank.

On August 17, 2020, following argument, the Honorable Jesse Furman issued an order temporarily restraining Brigade from "removing, withdrawing, transferring, assigning or otherwise disposing of" mistakenly transferred funds pending a final determination on the merits and setting that matter down for a Preliminary Injunction hearing on August 31. The Court should consolidate this case with the Brigade Action, enter an identical provisional relief, and handle this matter in parallel with the prior one.

There are no substantive differences between the allegations and events at issue here and those in the Brigade Action. Notably:

- Both cases concern mistaken payments that Citibank made on August 11, 2020;
- The erroneous payments at issue in both actions were made at the same time and involve the same error;
- All the erroneous payments related to interest on a loan to Revlon;
- The plaintiff is the same in both actions; and

- The Defendants are in the same position as the defendant in the Brigade Action (all are Fund Managers who received erroneous payments made on the Revlon loan and are refusing to pay them back).

Given the overlap of facts and issues, the Court should handle this action like the Brigade Action. It should (i) enter an identical TRO; and (ii) schedule a consolidated Preliminary Injunction hearing.

## **STATEMENT OF FACTS**

As detailed in Citibank's complaint, in 2016, Revlon took out a $1.8 billion loan to facilitate its acquisition of Elizabeth Arden, Inc. Compl. ¶ 12. HPS and Symphony among the lenders who provided capital for the loan, and Citibank served as the loan's administrative agent and collateral agent pursuant to the underlying credit agreement. *Id.* ¶¶ 16-17. Citibank was required to collect loan payments from Revlon, transfer the payments to creditors, and maintain a register detailing the amounts owed to each creditor and any loan payments made by Revlon. *Id.* ¶ 16-17. Under the terms of the agreement, Revlon is required to make regular interest payments. While it is *permitted* to prepay its principal obligations, any prepayment must be accompanied by written notice up to three business days in advance. *Id.* ¶ 18.

On August 11, 2020, Revlon was required to remit interest payments that Citibank would then remit to creditors in its status as administrative agent. Zeigon Decl. ¶ 19. The interest payment totaled $1,501,145.27. *Id.* ¶ 17. No other amount was due at the time. *Id.* ¶ 19.

Due to inadvertent human error, Citibank mistakenly transferred an amount far greater than the total interest payment due on August 11—over 100 times the interest that was actually due. *Id.* ¶ 20. HPS and Symphony were among the recipients of received overpayments. At the same time Defendants received those payments, they received all the information it needed to understand that the payments were mistaken. *Id.* ¶¶ 23. Most importantly, Citibank sent notices of payment describing each payment as a "Libor Rate Interim Interest Payment" and detailing Citibank's

calculation of the amount of *interest* due under the loan agreement (as well as the principal of the loan held by each fund). *Id.* ¶¶ 22-23.  These notices expressly referenced the *intended* amount of payment, which was *interest only* and more than 100 times smaller than the actual transferred amount. *Id.* ¶¶ 12, 17.

The mistaken overpayment was covered widely by news outlets around the world. Compl. ¶ 35. On both August 12 and August 13, 2020, Citibank sent notices to lenders requesting the excess funds be returned, informing lenders that "[a]n additional amount was included in your interest payment in error and you were overpaid." *Id.* ¶ 36.   Many of Revlon's lenders promptly complied and returned the funds. *Id.*  HPS and Symphony did not.

## ARGUMENT

"A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638, 650 (2d Cir. 2015) (quotation marks omitted). "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Spencer Trask Software & Info. Servs. v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

Citibank satisfies each of these requirements. The Court should enter a preliminary injunction and temporary restraining order barring HPS from removing, withdrawing, transferring, assigning, or otherwise disposing of the money mistakenly transferred to HPS by Citibank on August 11, 2020. The Court should also order a preliminary injunction directing HPS to remit to Citibank the full balance of the mistakenly transferred funds.

**I.  CITIBANK WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF AND A TEMPORARY RESTRAINING ORDER.**

"To satisfy the irreparable harm requirement, [a plaintiff] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted). "Irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

Courts in this Circuit have routinely found irreparable harm where there is a "risk that defendant will have dissipated the [funds] without paying the plaintiff, leaving the plaintiff out of luck and out of money." *Ger-Nis Int'l, LLC v. FJB, Inc.*, 2007 WL 656851, at *2 (S.D.N.Y. Mar. 1, 2007) (quotation marks omitted). Courts have therefore held that a "preliminary injunction is proper" "where the particular funds sought to be frozen are also the funds at issue in the suit." *Wishnatzki*, 2000 WL 1610790, at *1 (citations omitted). Indeed, the Supreme Court has explained that "[a] preliminary injunction is *always* appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (emphasis added); *see also*, *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11 CIV. 3489 JMF, 2013 WL 1915330, at *3 (S.D.N.Y. May 9, 2013) (preliminary injunction appropriate where movant "alleges not only a legal claim for money damages, but also an equitable claim"), *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 250 (S.D.N.Y. 2001) ("[W]here plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets.").

These principles are squarely applicable here. The funds mistakenly transferred to Defendants, and which Citibank requests to be remitted or frozen, are precisely the same funds at issue in this suit, and Citibank seeks both equitable and legal relief in relation to these specific funds. *See* Comp. ¶¶ 32-45. Absent injunctive relief, there is a substantial risk that Defendants will transfer or otherwise dissipate the funds, making Citibank unable to recover the full amount of the erroneous transfer. As described in the attached Declaration of Mitali Sohoni, Managing Director and Head of Financing and Collateralized Loan Obligations with Citigroup Inc.'s Markets and Securities Services, the ultimate beneficiaries of HPS's investment in the Revlon loan include investment vehicles such as collateralized loan obligations, which are required to regularly remit funds to their own investors. Sohoni Decl. ¶¶ 4-5. They also include several other funds that commonly commingle cash with other assets to make payments to fund beneficiaries. *Id.* ¶ 7. Based on information available to Citibank, HPS *itself* lacks sufficient net assets to satisfy a judgment of $174 million plus accrued interest. *Id.* ¶ 9. If Defendants transfers or disperses the funds to these beneficiaries, identifying the funds at issue and providing for their return to Citibank may prove impossible.

At minimum, then, HPS should be prohibited from transferring or otherwise dispersing the funds at issue in this suit. But we respectfully submit that broader relief is appropriate here: The Court should order HPS to return the funds that it has misappropriated from Citibank. Given HPS's brazen disregard for Citibank's rights and the terms of the underlying credit agreement, as well as the interests of third parties like Revlon, the safest course is to return to the status quo before Citibank mistakenly sent HPS the funds. And as discussed below, that relief is the most effective way to deter actors like HPS from threatening the integrity of the banking system with the behavior it has engaged in here.

## II. CITIBANK IS LIKELY TO SUCCEED ON THE MERITS.

Citibank has shown a "likelihood of success on the merits" of its claims, and certainly "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation." *Actavis*, 787 F.3d at 650. Citibank has brought a claim for unjust enrichment based on HPS's misappropriation of funds at the direct expense of Citibank (Compl. ¶¶ 51); a claim for conversion based on Defendants' exercise of unauthorized dominion over specifically identifiable Citibank assets (Compl. ¶¶ 53); claims for money had and received based on Defendants' receipt of, and benefit from, Citibank's money (*id.* ¶¶ 37-40); and claims for payment by mistake (*id.* ¶¶ 41-44).

### A.   The Payments Were a Mistake

Courts in this District have recognized that a refusal to return mistakenly received funds that are the rightful property of another is sufficient basis for all four of the causes of action raised in the complaint. *See, e.g.*, *Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 466 (S.D.N.Y. 2018) (plaintiff "adequately alleged the existence of unjust enrichment, conversion, and money had and received claims" based on defendant's withholding of funds of which plaintiff was "the rightful owner"); *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 4038826, at *7 (E.D.N.Y. Oct. 14, 2010) (plaintiff adequately alleged claims for money had and received, payment by mistake, and unjust enrichment on basis that defendant, "as a result of fraud and mistake, received money rightfully belonging to" plaintiff).

Citibank is likely to succeed on each of these claims for similar reasons: The circumstances clearly demonstrate that Citibank's transfer of excess funds on August 11 was a mistake, that the excess funds were the rightful property of Citibank, and that HPS was well aware that it had no legal right to retain the funds. This case is as straightforward as it gets. From the moment the

6

erroneous transfers were made, it was plain that the excess funds were not intentionally sent to Defendants.

To the extent Defendants argue that the excess funds were payment toward the loan principal, such a position is irreconcilable with the language of the notices and common sense. Such a payment was not even permissible under the credit agreement. Compl. ¶ 34. The balance of the loan was not due until 2023. And a prepayment of *any* amount was permissible only if Revlon provided "irrevocable written notice" of its intent to prepay within the three days preceding any prepayment. *Id.* No such prepayment notice was issued. *Id.* Revlon did not provide the excess payment funds to Citibank and confirmed as much in its public statements. *Id.* ¶ 23. Revlon lacked sufficient assets to facilitate a transfer of that size. *Id.* ¶ 2. And if any doubt remained, Citibank *told* HPS that the payments were mistaken, in notices issued promptly after the payment. Zeigon Decl. ¶ 22.

Notably, other creditors *did* return the overpayment amounts within days of the transfer. This wasn't an act of charity; it was the right thing to do, and a recognition that the funds belonged to Citibank. Citibank is likely to succeed in its efforts to recover the mistakenly transferred funds from Defendants

**B.    The "Discharge-For-Value" Rule Does Not Bar Preliminary Relief**

In the Brigade Action, Brigade relied heavily on the "discharge-for-value" doctrine, citing the New York Court of Appeals' decision in *Banque Worms v. Bankamerica*, 77 N.Y.2d 362 (1991).  Neither that doctrine nor that decision bar preliminary relief here.  At a minimum, the harm to Citibank if the doctrine is applied now would far outweigh any harm to Defendants if they must wait less than two weeks to have the matter decided on a fuller record at a preliminary injunction hearing.  Moreover, the discharge for value rule does not apply to the present circumstances.

To begin with, discharge-for-value, is an affirmative defense on which defendants will bear the burden of proof. *See, e.g.*, *In re Awal Bank*, 455 B.R. 73 (Bankr. S.D.N.Y. 2011) ("the discharge for value rule is an affirmative defense to be asserted by answer, and 'a plaintiff does not bear the burden of raising and refuting this defense in its opening pleadings'") (quoting *TD Bank v JPMorgan Chase Bank*, 2010 WL 4038826, at *6 n.8 (E.D.N.Y.)); *BMO Harris Bank v. Salin Bank & Trust Co.*, 2020 WL 2571251, at *8 (S.D. Ind.) ("At its core, the discharge for value rule is widely regarded and most easily applied as an affirmative defense, presupposing the validity of the claimant's causes of action.") (citing cases including *Banca Commerciale Italiana v Northern Trust*, 160 F.3d 90, 94 (2d Cir. 1998); Restatement Third of Restitution section 67). In order to use an affirmative defense to defeat provisional relief, the respondent must present actual evidence, not mere argument. *See Roswell Capital Partners LLC v. Alternative Const. Techs.*, No. 08 CIV 10647 (DLC), 2009 WL 222348, at *11 (S.D.N.Y. Jan. 30, 2009).

Among other things, Defendants will need to prove that they received the funds "without *any notice* of any wrong *and credited them* on an indebtedness *due them*." *Carlisle v. Norris*, 215 N.Y. 400, 415 (1915) (quoted in *Banque Worms v. Bankamerica*, 77 N.Y.2d 362, 368 (1991)) (emphasis added). The *Banque Worms* and *GECC v. Cent. Bank*, 49 F.3d 280 (7th Cir. 1995) decisions are distinguishable on all three elements.

In *Banque Worms*, there was no suggestion that the bank had any reason to believe that the payment was an error. Indeed, the opinion shows that the debtor actually did intend to pay Banque Worms; the error was that the originating bank failed to follow the debtor's instruction to *cancel* the original payment order. There was no express statement (which, in this case, was sent to Brigade *before* the payment) that a different amount would be paid and no failure of a required notice of prepayment. Thus, while *Banque Worms* does not expressly hold that constructive notice is sufficient, neither it nor any other case that we are aware of supports the argument that actual

8

notice is required. Section 14 of the Restatement (First) of Restitution, which *Banque Worms* adopts, states that the rule applies only where the transferee proves that it "does not know *or suspect*" the transferor's error. (Emphasis added.) The very helpful decision in *In re Calumet Farm, Inc.*, interpreting U.C.C. Article 4A (which is, after all, a uniform statute not unique to the Sixth Circuit), holds that constructive notice does apply. 398 F.3d 555, 560 (6th Cir. 2005) ("Any sensible application of the discharge-for-value rule in this unique setting must account for constructive as well as actual notice of a mistake.").

Further, there is no evidence that either Defendant "credited" Revlon in any manner. Again, that is essential under Restatement Section 14, adopted in *Banque Worms*, which limits the rule to situations where "it would be inequitable to require restitution from the transferee since, in the surrender of the debt or lien, *he has given value*." (Emphasis added.) As noted, the official record of Revlon's debt under the Credit Agreement is the Official Register, which is maintained by the Administrative Agent (Citibank), not by each lender; thus, Defendants had no ability to credit or discharge Revlon unilaterally. Moreover, Defendants' subsequent conduct, continuing to this day— including purporting to accelerate the debt and filing a lawsuit seeking its enforcement— consists of affirmative steps that are irreconcilable with the conclusion that it "discharged" the debt at any time and is totally unlike anything that occurred in *Banque Worms*.

All of this underscores the *Calumet* decision's emphasis that "[n]either this court's prior decision, *GECC*, nor *Banque Worms* purports to consider the question" of what "relevant event" is to establish discharge. 398 F.3d at 560. It holds that the defense will not apply if the "beneficiary receives notice of a mistake *before the beneficiary of the transfer credits the debtor's account*." *Id.* (emphasis added). In the *Qatar National Bank v. Winmar, Inc.* case, which, like this one, governed a Fedwire transfer that is governed by Federal Reserve Regulation J, the Court applied the rule as set forth in *Calumet* and held that the funds should be returned in part because the transferee

9

did not "present any evidence that it credited [the debtor]'s account prior to that date." 650 F. Supp. 2d 1, 19 (D.D.C. 2009). It, too, distinguished *GECC* and *Banque Worms* on the ground that "those cases do not offer substantial guidance in determining when notice must be received," whereas "*In re Calumet* does provide a detailed analysis of this issue." *Id.* at 18. There is no evidence of any such credit by either Defendant here.

Finally, in *Banque Worms*, there was no dispute that the debt to Banque Worms was "due them" at the time of payment. Here, there is no dispute that the outstanding principal was *not* due on August 11 and would not come due for another three years. Indeed, the undisputed facts are that Defendants participated in efforts to cause the debt to come due the next day, precisely so that it could opportunistically assert a contractual setoff right. That purported acceleration not only fails to support setoff, as the loan was not due when the payment was made, but they prove both that Defendants actually knew that the principal was not repaid and that it had not, in any sense, "discharged" the debt.

### III. THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY IN CITIBANK'S FAVOR.

The "balance of hardships" requirement is also straightforward. As discussed above, Citibank will suffer irreparable harm absent injunctive relief: It will not only be denied access to over a hundred million dollars that rightfully belong to Citibank; it will also risk the permanent loss of the funds as they are commingled with other assets and dissipated among investors. *See* pp. 4-5 *supra*. Defendants, by contrast, will suffer *no* legitimate hardship at all by losing access to funds that it never expected to receive and does not rightfully own. And particularly when the hardships to Citibank are aggregated—accounting for the total of $174,651,497.62 that was mistakenly transferred to Revlon lenders—the balance falls overwhelmingly on Citibank.

## IV. THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF.

Courts in this District have long recognized that "the public interest may be jeopardized" where wrongfully obtained funds "are not frozen or protected against possible dissipation" by the issuance of an injunction. *S.E.C. v. Wallis*, 1984 WL 803, at *3 (S.D.N.Y. May 31, 1984). Every day, financial institutions exchange billions of dollars via wire transfers, facilitating the quick and efficient flow of money between these institutions and their many clients. Such transfers are an essential part of the daily function of the global financial system. Given the ubiquity and frequency of wire transfers, it is inevitable that a certain number will be made in error, as was the case here.

When such erroneous transfers are made, the entity that made the mistake must have assurances that it will be able to recover the funds that remain its rightful property. Absent this certainty, the very foundations of the modern banking system would be undermined: The speed and efficiency of sending funds via wire transfer would be overshadowed by the possibility of catastrophic, irreversible harm resulting from a single mistake in executing a transfer. And the corresponding oversight and regulations required to prevent such a mistake from occurring would necessarily place considerable strain on the banking system—both in terms of time and resources.

If Defendants are not immediately required to return mistakenly transmitted funds, the result would be to *reward* such behavior. Defendants should not be permitted to keep over two hundred million dollars of Citibank's money (and certainly without restriction) while Citibank is forced to litigate its claim to conclusion. This would only encourage other entities that receive funds in error to remain similarly uncooperative and intransigent. The primary cost to a party for doing so would be the prospect of repaying the funds at a later date, while that same party would enjoy the benefits of an unexpected injection of liquidity in the meantime. The public has an undeniable interest in discouraging such bad faith efforts, and no corresponding interest in

allowing those who receive funds in error to keep them while the rightful owner waits for an award of money damages. The public interest weighs in favor of granting injunctive relief.

## **CONCLUSION**

For these reasons, Citibank respectfully requests that this Court:

1. issue a preliminary injunction, pursuant to Rule 65, ordering HPS to remit to Citibank funds in the amount of $127,336,420.54 and

2. issue a preliminary injunction pursuant to Rule 65 ordering or Symphony to remit to Citibank funds in the amount of $109,673,303.62; or

3. in the alternative, issue a preliminary injunction and temporary restraining order ordering HPS, its officers, agents, employees, successors, and all those in active concert or participation with them to refrain immediately from removing, withdrawing, transferring, assigning, or otherwise disposing of funds mistakenly transferred to Defendants by Citibank on August 11, 2020, pending a final determination on the merits in this action.

Dated: August 18, 2020
      New York, New York

                                Respectfully submitted,

                                THE LAW OFFICES OF JOHN F. BAUGHMAN, PLLC

By: *[signature]*
      John F. Baughman
John F. Baughman
Nathaniel E. Marmon
299 Broadway, Suite 207
New York, New York 10007
(347) 241-6347

*Attorneys for Plaintiff Citibank, N.A*